UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
04-CV-1461(JMR/FLN)

Jeff Siebert et al.                    )
                                       )
            v.                         )        ORDER
                                       )
Amateur Athletic Union of the          )
United States, Inc., (AAU) et al.      )


     Plaintiffs claim they suffered disability-based discrimination
when the Amateur Athletic Union ("AAU") declined to provide an
American Sign Language interpreter during plaintiff's participation
in an AAU basketball program.  They seek relief under both the
Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA"),
and the Minnesota Human Rights Act, Minn. Stat. §§ 363A.01-.41
("MHRA").[1]  Defendants move to dismiss.  For the reasons set forth
below, Jeff and Cindy Siebert's claims regarding the 2003 season
are dismissed.  The remainder of this action is stayed pending
arbitration.

---

[1]Plaintiffs brought their claim under Minn. Stat. § 363.01 et
seq. (Complaint ¶ 1.)  After they filed their complaint, the
Minnesota legislature repealed and renumbered the MHRA.  For
convenience and clarity, this opinion employs the current numbering
scheme.

I. Background[2]

Plaintiffs, Jeff Siebert and his minor daughters, Amy and Cindy, are deaf. They primarily communicate through the use of American Sign Language ("ASL"). In the spring of 2001, defendants[3] recruited Amy to play girls' basketball. Amy requested the services of an ASL interpreter. When her request was denied, she declined to participate. Now age 17, Amy plays high school varsity basketball at the Minnesota State Academy for the Deaf.

In 2003, Mr. Siebert decided he and Cindy would again attempt to participate in defendants' basketball program. He expected another refusal to provide an interpreter, but claims he hoped to effect a change in the AAU. He apparently also decided that if defendants maintained their refusal, he would invoke federal and state disability discrimination laws.

Mr. Siebert coached, and Cindy played for, defendants' basketball team. As expected, defendants refused the request to

---

[2]Except where noted, the facts are either undisputed or taken in the light most favorable to plaintiffs, as required when considering matters outside the pleadings on a motion under Rule 12(b)(6). Fed. R. Civ. P. 12(b); Osborn v. United States, 918 F.2d 724, 729 (8th Cir. 1990).

[3]Defendant Minnesota AAU is an Association, or affiliated subsidiary member, of defendant AAU. Its function is to provide administrative services and support for AAU sports programs in Minnesota. (Affidavit of David E. Cammarotto, September 26, 2005, Exs. J, K.) Defendant Minnesota Youth Athletic Services ("MYAS") is an "information channel" by which AAU communicates information about its programs. (Id., Ex. L.) Unless otherwise specified, "defendants" or "AAU" refers to all three defendants.

provide an ASL interpreter, prompting the Sieberts to hire their own interpreter at a cost of $1,200 for the 2003 season. Plaintiffs claim that if defendants had provided an interpreter, Amy would also have joined the AAU and participated in the girls' basketball program.

The Sieberts filed this action in April, 2004, alleging that defendants' refusal to provide an ASL interpreter violated both the MHRA and the ADA. In lieu of answering the complaint, defendants moved to dismiss the action, pursuant to Fed. R. Civ. P. 12(b), claiming the Sieberts are contractually obliged to submit all claims to binding arbitration in Florida.

The AAU requires that its members bind themselves to the AAU Codebook, an online-accessible document. The 2003 Codebook contains both mandatory arbitration and forum selection clauses. Taken together, these clauses mandate that all disputes between the AAU and its members be arbitrated in Florida. When joining the AAU, the applicant must complete the AAU's online membership form. As part of that process, applicants click a box indicating their "agree[ment] to be bound" by the Codebook terms. (Affidavit of Jan Lyon ¶ 5 and Ex. A-6.) In bold type, on the AAU's membership web page, is the following language:

> I agree to be bound by the AAU Code as well as all AAU operating procedures and policies, including but not limited to: binding arbitration and the release and indemnity of the AAU.

(Id.)  After applicants click "continue" to manifest acceptance of these terms, each of the next two screens remind them they may request a refund within 30 days if the athlete does not participate in any activities.  (Lyon Aff. Exs. A-7 and A-8.)

Jeff and Cindy Siebert did not complete the AAU online membership applications; their forms were completed and submitted by John Durham, the team's head coach.  Mr. Durham completed the applications on February 27, 2003, and shortly thereafter notified the Sieberts and other team members that their applications were being processed.  (Affidavit of John Durham ¶¶ 7-8 and Ex. A.)  The email notifying the Sieberts of their admission into the AAU's program attached an "order summary" from the AAU website.  This communication included the following language:

> If accepted as a club member, we agree to abide by the policies and procedures of the Amateur Athletic Union of the United States, Inc., and to respect and adhere to the By-Laws of the AAU Association in which we are applying for membership.

(Durham Aff. Ex. A.)

Jeff and Cindy Siebert paid their AAU dues.  Upon doing so, each received and signed individual AAU membership cards.  Each card bore a printed statement above the signature line saying:

> I agree to be bound by the AAU code as well as all AAU operating procedures and policies, including but not limited to:  binding arbitration and the release and indemnity of the AAU.

(Lyon Aff. ¶ 5 and Ex. A-12.)

The full text of the AAU's arbitration and forum selection

4

clauses appear in its 164-page 2003 Codebook, which is only available online.  Plaintiffs aver that they never reviewed the Codebook or read the arbitration or forum selection clause terms until they filed this action.

The 2003 season was the only time plaintiffs Jeff and Cindy Siebert belonged to the AAU or participated in its events.  Amy Siebert never joined the AAU, nor did she participate in its sporting events.  All plaintiffs opted against joining the AAU after the 2003 season; instead, they claim they wished to participate in the AAU girls' basketball program -- and would have done so -- but for defendants' unwillingness to provide an ASL interpreter.

II.  <u>Discussion</u>

The Sieberts claim their rights, as defined by the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, and the Minnesota Human Rights Act, Minn. Stat. §§ 363A.01-.41, have been violated.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

Defendants' Rule 12(b)[4] motion to dismiss the complaint avers

---

[4] Defendants' motion is premised on both Rules 12(b)(2) and 12(b)(6).  Their brief does not address Rule 12(b)(2), and the Court discerns no factual basis for a separate Rule 12(b)(2) defense.  As a result, defendants' 12(b)(2) motion is denied. Circuits are split as to whether the preferred motion for dismissal on the basis of a forum selection or arbitration clause lies under Rule 12(b)(1), 12(b)(3) or 12(b)(6).  <u>See, e.g.</u>, 5B Wright & Miller, <u>Federal Practice & Procedure</u>, § 1352 (3d ed. 2004 & Supp. 2005); <u>Lim v. Offshore Specialty Fabricators, Inc.</u>, 404 F.3d 898, 902 (5th Cir. 2005).  As this remains an open question in the Eighth Circuit, <u>Rainforest Café, Inc. v. Eklecco, L.L.C.</u>, 340 F.3d 544, 545 n.5 (8th Cir. 2003), the Court accepts that the motion has been

that, if plaintiffs have any standing to assert claims against the AAU, their rights are limited to those afforded AAU members.  This would bar Amy Siebert's claims entirely, as she never joined the AAU, and would similarly bar any claim by Jeff or Cindy Siebert after spring 2003, as they declined to join after that year.

For the reasons set forth herein, the Court finds Jeff and Cindy Siebert must pursue their remedies by arbitration as required by their membership in the AAU.  The Court finds Amy Siebert has standing to bring her claims in this Court, and Jeff and Cindy Siebert may assert claims for periods beyond the 2003 season.

A.  <u>Claims Beyond the 2003 Season</u>

Parties seeking to establish Article III standing must prove (1) they suffered an "injury-in-fact"; (2) a causal relationship between the injury and the challenged conduct; and (3) that the injury likely will be redressed by a favorable decision.  <u>Steger v. Franco, Inc.</u>, 228 F.3d 889, 892 (8th Cir. 2000).  An injury-in-fact is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical."  <u>Id.</u> (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992)).  Plaintiffs need not engage in futile gestures such as, in the context of an entirely different ADA case, "visiting a building containing known barriers that the owner has no intention of remedying."  <u>Steger</u>, 228 F.3d at 892.  But the injury must exist, and be likely to exist in the future.

---

properly placed under Rule 12(b)(6).

Here, the Court finds the Sieberts have standing to raise their claims; each asserts a need for an ASL interpreter to facilitate participation in AAU activities.  The AAU says it will not provide one.  Plaintiffs declare that, but for the AAU's refusal, they would have participated in AAU sports in 2003 and thereafter.  Having expressed their intent to join the AAU, if provided ASL interpreters, and because AAU membership is required to participate, the Court concludes that granting the relief requested by the Sieberts will redress their asserted grievances.  Therefore, plaintiffs have standing.

B.  <u>Arbitration of Jeff and Cindy Siebert's 2003 Claims</u>

Defendants claim Jeff and Cindy Siebert are obliged to arbitrate their claims in Florida.  The Court concurs, finding there is a binding arbitration agreement which bars the Sieberts[5] from pursuing their 2003 claims here.

Both state and federal governments have strong policies favoring arbitration.  <u>See</u> <u>Green Tree Fin. Corp. v. Randolph</u>, 531 U.S. 79, 89-90 (2000); <u>Eden Land Corp. v. Minn-Kota Excavating, Inc.</u>, 223 N.W.2d 658, 659 (Minn. 1974).  Questions of arbitration are governed by the Federal Arbitation Act (or "FAA"), 9 U.S.C. § 1 <u>et seq.</u> (1999).  The FAA was enacted to "reverse the longstanding judicial hostility to arbitration agreements" and

---

[5]In this discussion of the arbitration issues, "the Sieberts" refers only to Jeff and Cindy Siebert.

treat arbitration agreements like any other contract. <u>Green Tree</u>, 531 U.S. at 89. Minnesota has adopted very similar – but not identical – statutory language concerning the validity of arbitration agreements. <u>See</u> Minn. Stat. § 572.08 (2004).[6] To the extent there is any conflict between the state and federal statutes, federal law preempts Minnesota law. <u>Onvoy, Inc. v. SHAL, LLC</u>, 669 N.W.2d 344, 351 (Minn. 2003).

Under the Federal Arbitration Act, a court will enforce an arbitration agreement unless a party can show it will not be able to vindicate its rights in the arbitral forum. <u>Green Tree</u>, 531 U.S. at 90. The Supreme Court has extended this policy to claims arising under specific anti-discrimination statutes which are intended to "further important social policies." <u>See</u> <u>Gilmer v. Interstate / Johnson Lane Corp.</u>, 500 U.S. 20, 27 (1991) (holding Age Discrimination in Employment Act claims are arbitrable). A party wishing to avoid arbitration must show that "Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." <u>Id.</u>

These principles require the Court to consider "(1) whether

---

[6]Compare the Federal Arbitration Act, 9 U.S.C. § 2 (pre-dispute arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract") with the Minnesota Arbitration Act, Minn. Stat. § 572.08 (2004) (pre-dispute arbitration agreements "valid, enforceable, and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract.")

there is a valid arbitration agreement and (2) whether the particular dispute falls within the terms of that agreement." Faber v. Menard, Inc., 367 F.3d 1048, 1052 (8th Cir. 2004).  The Court concludes that the answer to each question is "Yes."

    1.  The Arbitration Agreement

Minnesota law governs the question of whether an arbitration agreement is valid and enforceable.  Id., citing 9 U.S.C. § 2; see also Minn. Stat. § 572.08.  The Sieberts claim Minnesota law renders the AAU's arbitration agreement invalid.  First, they state they never agreed to arbitrate; and second, the AAU arbitration agreement is unconscionable.  The Sieberts are incorrect.

The Court considers first whether the Sieberts agreed to arbitrate.  Although arbitration is contractual in nature, a person who did not physically sign an agreement may be bound by it on "the ordinary principles of contract and agency."  See Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773, 776 (2d Cir. 1995), cited in CD Partners, LLC v. Grizzle, 424 F.3d 795, 799 (8th Cir. 2005).  Because contract and agency principles derive from state law, federal courts look to state law.  Flink v. Carlson, 856 F.2d 44, 46 n.2 (8th Cir. 1988).

Under Minnesota law, a party's assent to a contract is judged by the party's objective conduct, rather than their subjective intent.  See Cederstrand v. Lutheran Bhd., 117 N.W.2d 213, 221 (Minn. 1962).  Thus, one who authorizes an agent to perform an act

9

may impliedly authorize the agent to enter into a contract on his behalf.  See Hornblower & Weeks-Hemphill Noyes v. Lazere, 222 N.W.2d 799, 805 (Minn. 1974) (implied authority includes "powers . . . directly connected with and essential to the business specifically entrusted to an agent"); Rehnberg v. Schranck, 2001 WL 1132203, *2 (Minn. Ct. App. 2001) (unpublished) (upholding arbitration clause signed by seller's agent); Restatement (Second) of Agency § 50 (1958) ("[A]uthority to make a contract is inferred from authority to conduct a transaction, if the making of such a contract is incidental to the transaction, usually accompanies such a transaction, or is reasonably necessary to accomplish it.")

The Sieberts admit they intended to join the AAU, and that they authorized Mr. Durham to apply for AAU membership on their behalf.  When he did, they thereby agreed to the terms of the AAU's form contract.   The contract was "directly connected with and essential to the business specifically entrusted to" Mr. Durham by the Sieberts.  Hornblower, 222 N.W.2d at 805.

The Court finds Mr. Durham's assent was valid, whether or not he actually read the arbitration and forum selection clauses.  Absent fraud or misrepresentation, "a person who signs a contract may not avoid it on the ground that he did not read it or thought its terms to be different." Malecha v. St. Croix Valley Sky Diving Club, 392 N.W.2d 727, 731 (Minn. Ct. App. 1986) (citing Gartner v. Eikill, 319 N.W.2d 397, 398 (Minn. 1982)).

The AAU requires that those wishing to become members "click" on the page which states that any disputes are subject to arbitration.  This Court finds that the "click" represents assent to the contract, including the arbitration clause.  Most courts which have considered the issue have upheld arbitration and forum selection clauses in so-called "clickwrap" or "shrinkwrap" form contracts.  These occur when the terms are provided online, or only after plaintiffs have manifested assent.  <u>See, e.g.</u>, <u>Hill v. Gateway 2000, Inc.</u>, 105 F.3d 1147, 1150 (7th Cir. 1997) (shrinkwrap arbitration clause valid and enforceable); <u>Koresko v. RealNetworks, Inc.</u>, 291 F. Supp. 2d 1157, 1163 (E.D. Cal. 2003) (enforcing clickwrap forum selection and arbitration clause); <u>Westendorf v. Gateway 2000, Inc.</u>, 2000 WL 307369, *4 (Del. Ch. March 16, 2000) (unpublished) (third-party beneficiary bound by shrinkwrap arbitration agreement in gift computer package), <u>aff'd</u>, 763 A.2d 92 (Del. 2000).[7]  Mr. Durham's click of the word "continue" bound the

---

[7] <u>See also</u> <u>DeJohn v. .TV Corp. Int'l</u>, 245 F. Supp. 2d 913, 918-19 (N.D. Ill. 2003) (enforcing clickwrap forum selection clause); <u>Forrest v. Verizon Communications, Inc.</u>, 805 A.2d 1007, 1008-09 (D.C. 2002) (same); <u>America Online, Inc. v. Booker</u>, 781 So. 2d 423, 425 (Fla. Dist. Ct. App. 2001) (same); <u>Caspi v. Microsoft Network, L.L.C.</u>, 732 A.2d 528, 533 (N.J. Super. Ct.. App. Div. 1999) (same); <u>Mortgage Plus, Inc. v. DocMagic, Inc.</u>, 2004 WL 2331918, *6 (D. Kan., Aug. 23, 2004) (unpublished) (same); <u>Hopkins v. Trans Union, L.L.C.</u>, 2004 WL 1854191, *2 (D. Minn., Aug. 19, 2004) (unpublished) (Montgomery, J.) (same); <u>see</u> <u>generally</u> Kevin W. Grierson, Annotation, <u>Enforceability of "Clickwrap" or "Shrinkwrap" Agreements Common in Computer Software, Hardware, and Internet Transactions</u>, 106 A.L.R. 5th 309 (2004).  The Electronic Signatures in Global and National Commerce Act, commonly known as the "E-Sign Act", provides that a contract may not be denied validity solely because it is in electronic form.  15 U.S.C. §§ 7001-7031 (2000).

Sieberts to the AAU Code.

The Sieberts ultimately received personal notice of the arbitration agreement.  Their email from Mr. Durham advised them that their applications were being processed.  While the AAU order summary did not mention the Code or its arbitration and forum selection provisions, it did say the team had agreed to abide by AAU policies and by-laws as a condition of membership.  This was soon followed by the Sieberts' personal receipt of individual membership cards, which each one signed.  Above the signature line the terms are explicit:  "I agree to be bound by the AAU code as well as all AAU operating procedures and policies, including but not limited to:  binding arbitration and the release and indemnity of the AAU."  Plaintiffs were bound by their contract and had actual notice of one of the terms they now oppose.

Plaintiffs next claim the Court should not enforce their agreement, either because it is a contract of adhesion or imposes unconscionable burdens.  Minnesota courts may refuse to enforce contracts of adhesion.  This is a contract which "is drafted unilaterally by a business enterprise and forced upon an unwilling or unknowing public for services that cannot readily be obtained elsewhere."  Schlobohm v. Spa Petite, Inc., 326 N.W.2d 920, 924 (Minn. 1982).  Contracts offered on a "take-it-or-leave-it" basis, however, are not necessarily contracts of adhesion.  Id. Rather, plaintiffs must show (1) a great disparity in bargaining power with

no opportunity for negotiation; and (2) that the services offered by defendants are a public necessity and cannot be obtained elsewhere.  <u>Id.</u> at 924-25.

Assuming without deciding that plaintiffs can meet <u>Spa Petite's</u> first element, they entirely fail to meet the second.  The services contemplated by the second aspect of the adhesion-contract rule are those "generally thought suitable for public regulation," including "common carriers, hospitals and doctors, public utilities, innkeepers, public warehousemen, employers, and services involving extra-hazardous activities."  <u>Id.</u> at 925.  Recreational activities generally do not qualify.  <u>Id.</u> at 926.

The AAU girls' basketball program may be desirable, even unique, among girls' basketball programs, but that does not make it a "necessity" within the contemplation of the adhesion-contract rule.  Like the spa in <u>Spa Petite</u>, the AAU is a private organization under no obligation to accept plaintiffs as members; having consented to accept them for a modest fee, the AAU may insist upon terms it deems appropriate.  <u>Id.</u>  The mere scarcity – even if one were demonstrated – of comparable girls' basketball programs does not transform the AAU's program into a necessity. Indeed, Amy Siebert has found an alternative, playing on the Minnesota State Academy for the Deaf varsity team.  Plaintiffs were under no compulsion to play, or coach, AAU girls' basketball; they had the choice to participate according to the AAU's rules, or

13

could freely decline to do so.   See Malecha, 392 N.W.2d at 730.
Accordingly, the Court finds the agreement between these parties is
not one of adhesion.

The Court does not find its terms so one-sided as to be
unconscionable.   Minnesota defines an unconscionable contract as
one "such as no man in his senses and not under delusion would make
on the one hand, and as no honest and fair man would accept on the
other."  In re Hoffbeck, 415 N.W.2d 447, 449 (Minn. Ct. App. 1987)
(quoting Hume v. United States, 132 U.S. 406, 411 (1889)).   While
a court may refuse to enforce unconscionable contracts, Minn. Stat.
§ 336.2-302(1) (2004), the court is to do so to prevent oppression
and unfair surprise.   Lyon Fin. Servs. Inc., v. Young Vending
Servs., 2003 WL 22177597, *3 (Minn. Ct. App., Sept. 23, 2003)
(unpublished).

Plaintiffs claim this arbitration agreement is unconscionable
because:  (a) arbitration is cost-prohibitive; (b) it allows only
limited discovery and no punitive damages; (c) it may be
unilaterally modified by the AAU; and (d) Florida is an
inconvenient forum.   For the reasons set forth below, the Court
will address the first and last points; the remaining points are
for the arbitrator.

An arbitration clause which imposes too heavy a financial
burden may be unconscionable.   See Green Tree, 531 U.S. at 90
(arbitration clause); Faber, 367 F.3d at 1053 (same).  To establish

14

unconscionability, plaintiffs must show arbitration will be cost-prohibitive considering (1) likely arbitrators' fees, and (2) plaintiffs' financial ability to pay them.  <u>Faber</u>, 367 F.3d at 1054.  In contrast to the plaintiff in <u>Faber</u>, plaintiffs here have proferred evidence concerning the costs of arbitration.

Plaintiffs have shown that AAU arbitration is governed by the Commercial Arbitration Rules and Mediation Procedures ("Procedures") of the American Arbitration Association ("Association"), which bases its fees on the dollar amount of plaintiffs' claim.  (Affidavit of Frank Zotto ¶¶ 6-7.)  They use the Association's commercial arbitration fee schedule to estimate an initial filing fee of $2,750 and case service fee of $1,250, consistent with a claim seeking between $150,000 and $300,000. (<u>Id.</u> at ¶ 8, and Ex. A at 57.)  Plaintiffs next posit that, as filing parties, they would be required to pay the entire filing fee and half of the case service fee, for a total of $3,375.

Plaintiffs next assert they must pay half of the arbitrator's fee based on the time needed and the matter's complexity. Plaintiffs claim Florida arbitrators charge from $500 to $4,000 per day, and assume their arbitrator's fees will fall precisely in the middle of that very wide range. Plaintiffs assume the arbitrator will spend 7 full days on

15

the case:[8] four days for the hearing, with three days for adjudication.  (Affidavit of Roderick J. MacPherson III ¶ 8.) Thus, plaintiffs estimate their half of the arbitrator's fee would total $7,875.

Plaintiffs also claim they must pay for an interpreter, at a rate of $120 an hour, or $960 per day.  They extend this rate for four days, to reach charges of $3,840.  Plaintiffs' share of a four-day hearing room rental would be $750.  From this, plaintiffs predict $15,840 in fees and costs.

On top of this, plaintiffs add the costs of travel to Florida, including airfare and five days' lodging for all three plaintiffs and their counsel, amounting to $3,719.  Plaintiffs claim they anticipate presenting live testimony from at least one Minnesota witness, with associated costs of $758.  Adding together each of these suppositions, plaintiffs estimate arbitration in Florida will cost them $20,317.[9]

The Sieberts claim that, as they support three children on a combined net annual income of $68,000, this amounts to an unconscionable burden.  The Court, however, remains mindful of two

_____

[8]The Court considers this unlikely in the extreme.  It discerns no reason that most the relevant facts cannot be stipulated:  indeed, the Court hazards a guess that they are virtually all set forth in the body of this Opinion. But it is not for the Court to conjecture on such matters.

[9]Plaintiffs' estimate of $21,692 (Macpherson Aff. Ex. A) erroneously assumes they would be liable for the entire case service fee and hearing room costs, rather than half.

16

facts:  First, the fees and costs are driven by factors to some extent within plaintiffs' control, such as the size of plaintiffs' demand and the way they anticipate presenting their case.  Second, the AAU has procedures precisely designed to ensure arbitration does not become cost-prohibitive.  The Sieberts factor these at zero.

For example, the Association may waive its administrative fees upon a showing of extreme financial hardship.  (Zotto Aff. ¶¶ 11-13.)  Where the Association has waived its administrative fees, it will seek to appoint a pro bono arbitrator for a one-day hearing "where the inability of one party to pay the arbitrator may prevent the case from going forward."  (Zotto Aff. ¶ 13.)  The arbitrator is also able to allocate both administrative and arbitrator fees in the award.  (Id. Ex. A at 56.)  To the extent travel costs are a concern, the Association rules permit parties to waive an oral hearing, and do not forbid the presentation of testimony by telephone or deposition.  (Id. Ex. A at 32-33.)  The rules explicitly allow evidence presentation by declaration or affidavit. (Id. Ex. A at 34.)[10]

Finally, the Court notes the Association's Supplementary Procedures for Consumer-Related Disputes between individual

---

[10]As noted, this is a Rule 12(b) motion.  The Court therefore assumes the facts in the light most favorable to plaintiff.  At the same time, the Court has no hesitation in noting that this recitation of conceivable expense enlightens the term "parade of horribles."

consumers and businesses where the business has:

> a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices.  The product or service must be for personal or household use.

(Id., Ex. A at 56.)  These procedures, effective September 15, 2005, may be found online at http://www.adr.org/sp.asp?id=22014. In addition to providing significantly lower fees,[11] these procedures explicitly allow for a telephone hearing or for a "desk arbitration," where the entire dispute is submitted in writing. (Id. at 2.)  As suggested in footnote 8, this is scarcely inconceivable in this case.

The Eighth Circuit has held that before a court can determine whether an arbitration agreement is unconscionable due to prohibitive cost, the party seeking to invalidate the agreement must have "fully explored" a fee waiver, including providing financial information to the Association, and presenting a realistic demand for damages. Dobbins v. Hawk's Enters., 198 F.3d 715, 717 (8th Cir. 1999).  If no waiver is granted, or the cost remains beyond plaintiffs' reach, the agreement may yet be saved

---

[11]Under the consumer rules, plaintiffs would owe a maximum of $125.   See American Arbitration Association, Supplementary Procedures for Consumer-Related Disputes, Rule C-8, referenced at Zotto Aff., Ex. A at 56.  The fee structure under these rules virtually ensures that arbitration will not be cost-prohibitive. See Jones v. Genus Credit Management Corp., 353 F. Supp. 2d 598, 602 (D. Md. 2005) (rejecting unconscionability argument).

from invalidation if the defendants offer to pay the arbitration fees.  Id.

None of this has happened here.  Plaintiffs have neither asked the Association for a fee waiver[12] or pro bono arbitrator, nor have they explored whether defendants might be willing to pay some or all of the fees.  They have not reduced their demand for damages;[13] and they have not considered whether the Association's far less costly Supplementary Consumer Arbitration rules might apply.   On this record, the Court cannot agree that the costs of arbitration prevent plaintiffs from effectively asserting their claims.  The fee-splitting arrangement does not render the arbitration agreement unconscionable due to cost.[14]

Plaintiffs also take issue with specific terms in the

---

[12]Rather than apply for a fee waiver, Plaintiffs assume they will not qualify, based on information posted on the Association's website.  (Pl. Mem. at 17.)  The Court finds this insufficient to comply with the Eighth Circuit's direction in Dobbins.  198 F.3d at 717.

[13]Based on their estimate of the arbitration fees, plaintiffs appear to be seeking more than 100 times the $1,200 they paid the interpreter.   If plaintiffs sought only $1,200, their administrative fees would be $600, up to $300 of which might be refunded (see Zotto Aff. Ex. A at 57, 59).

[14]Plaintiffs point to cases from other Circuits which, in the employment discrimination context, have found arbitration prohibitively expensive for plaintiffs.  See Cole v. Burns Int'l Security Servs., 105 F.3d 1465 (D.C. Cir. 1997) (upholding agreement but requiring employer to pay all fees) and Shankle v. B-G Maint. Management, 163 F.3d 1230 (10th Cir. 1999) (relying on Cole to invalidate a fee-splitting arrangement).  The Eighth Circuit has cited Cole only once, to distinguish it.  Faber, 367 F.3d at 1053. Otherwise, neither case has been followed in this Circuit.

arbitration agreement, claiming it is unconscionable in (1) limiting discovery,[15] (2) waiving punitive damages, (3) allowing the AAU to unilaterally modify the contract, and (4) requiring arbitration in Florida. The Court concludes that the first three are issues for the arbitrator; the fourth will be addressed in the discussion of the forum selection clause.

As the Eighth Circuit held in the context of employment-related arbitration agreements:

> In an evolving climate such as this, if we were to hold entire arbitration agreements unenforceable every time a particular term is held invalid, it would discourage parties from forming contracts under the FAA and would severely chill parties from structuring their contracts in the most efficient manner for fear that minor terms eventually could be used to undermine the validity of the entire contract. Such an outcome would represent the antithesis of the liberal federal policy favoring arbitration agreements.

Gannon v. Circuit City Stores, Inc., 262 F.3d 677, 682 (8th Cir. 2001) (internal quotation omitted). Accordingly, the Court holds that rather than finding the arbitration clause unconscionable, it is proper to allow the arbitrator to decide in the first instance the validity of these provisions. Id. at 681 & n.6; Larry's United Super, Inc. v. Werries, 253 F.3d 1083, 1086 (8th Cir. 2001) (validity of RICO punitive damages waiver a question for

---

[15]The Court wonders how much discovery is really needed in this case. The fact that the plaintiffs wished for an ASL interpreter seems undisputed. The defendant's having declined to provide one seems beyond dispute. And the cost of such services should be capable of ascertainment, without too great a cost.

arbitrators, not courts).

The "extent of an arbitrator's procedural and remedial authority are issues for the arbitrator to resolve in the first instance." Bailey v. Ameriquest Mortgage Co., 346 F.3d 821, 824 (8th Cir. 2003).  According to Bailey,:

> When an agreement to arbitrate encompasses statutory claims, the arbitrator has the authority to enforce substantive statutory rights, *even if those rights are in conflict with contractual limitations in the agreement that would otherwise apply.*

Id. (emphasis added.)  In other words, the arbitrator may disregard AAU limitations which conflict with substantive rights protected by the ADA and MHRA.

Courts which have previously considered the AAU's arbitration and forum selection clauses have uniformly enforced them.  See Smith v. Dodd, No. 01ca766 (D.C. Sup. Ct., May 7, 2001) (Jackson, J.) (unpublished) (Affidavit of David E. Cammarotto, August 23, 2005, Ex. E); Amateur Athletic Union v. Smith, 6:02-CV-0889 and 6:02-CV-1140 (M.D. Fl., Oct. 18, 2002) (Fawsett, J.) (unpublished) (Id. Ex. F); Smith v. Martin, No. 02-CV-1264 (D. D.C., July 31, 2003) (Kessler, J.) (unpublished) (Id. Ex. G); District of Columbia Ass'n of the Amateur Athletic Union of the United States, Inc. v. Armstrong, No. 03ca4636 (D.C. Sup. Ct., Aug. 19, 2003) (Campbell, J.) (unpublished) (Id. Ex. H); Brown v. Amateur Athletic Union, No. 03-03981-E (Dallas Co. Dist. Ct., 101st Judicial Dist., October 28, 2003) (Id. Ex. I).  Plaintiff has cited no case, and this Court is

aware of none, declining to enforce the AAU's arbitration clause.
For all of these reasons, the Court holds that the arbitration
clause is valid.

    2. <u>This dispute is within the AAU Agreement</u>

    Here, the Court considers whether the issues are arbitrable;
and second, whether Congress intended to preclude a waiver of
judicial remedies. When deciding whether the parties agreed to
arbitrate a particular dispute, state law governs. <u>First Options
of Chicago, Inc. v. Kaplan</u>, 514 U.S. 938, 944 (1995). The question
of arbitrability is for the Court unless there is "clear and
unmistakable" evidence that the parties intended this question to
be resolved by the arbitrator. <u>Id.</u> In other words, doubts about
which *tribunal* should decide arbitrability should be resolved by
the Court; doubts about whether an *issue* is arbitrable should be
decided in favor of arbitration. <u>Id.</u> at 944-45. Absent any
indication that the parties agreed to have an arbitrator decide
arbitrability, the Court proceeds with its inquiry.

    "The issue of arbitrability is to be determined by
ascertaining the intention of the parties by the language of the
arbitration agreement itself." <u>Cell v. Moore & Schley Securities
Corp.</u>, 449 N.W.2d 144, 146 (Minn. 1989) (citing <u>State v.
Berthiaume</u>, 259 N.W.2d 904, 909 (Minn. 1977)). The AAU's
arbitration clause provides that "any and all civil disputes" shall
be submitted to arbitration "pursuant to the rules and/or

guidelines as set out by the American Arbitration Association and to the Arbitration code of [Florida].[16]"   (MacPherson Aff. Ex. K at 132.)

The American Arbitration Association rules provide that, once invoked, "the parties shall be deemed to have made these rules a part of their arbitration agreement," although "by written agreement, [they] may vary the procedures set forth in these rules." (Zotto Aff. Ex. A at 17.)  The Court finds no words in the arbitration clause which limit the arbitrator's jurisdiction. Accordingly, the Court finds this dispute falls squarely within the agreement's terms.   As such, any objection to the arbitrator's jurisdiction, "including any objections with respect to the existence, scope or validity of the arbitration agreement," is left to the arbitrator.  (Id. at 21.)

The Court finds no suggestion that Congress intended to preclude the use of arbitration in this dispute.  Although neither the United States Supreme Court nor the Eighth Circuit has directly addressed the ADA, other anti-discrimination statutes, such as ADEA and Title VII, have been held subject to binding arbitration.  See Gilmer, 500 U.S. at 35 (plaintiff obliged to arbitrate ADEA claim); Patterson v. Tenet Healthcare, Inc., 113 F.3d 832, 837 (8th Cir. 1997) (plaintiff obliged to arbitrate Title VII and Missouri Human

---

[16]The parties have not briefed, and the Court does not consider, the impact of Florida's Arbitration Code.  Fla. Stat. §§ 682.01-.22.

Rights Act claims).

Other courts, following <u>Gilmer</u>, have held ADA claims subject to binding arbitration.  See <u>McWilliams v. Logicon, Inc.</u>, 143 F.3d 573, 576 (10th Cir. 1998); <u>Miller v. Public Storage Management, Inc.</u>, 121 F.3d 215, 218 (5th Cir. 1997); <u>Santos v. GE Capital</u>, 397 F. Supp. 2d 350, 356 (D. Conn.  2005).  The 1991 Civil Rights Act amended both Title VII and the ADA to include language encouraging alternative dispute resolution.[17]

In <u>Gilmer</u>, the Supreme Court found legislative history relevant in determining Congress's intent to preclude a waiver of judicial remedies.  500 U.S. at 26.  Plaintiffs here argue that a legislative report evinces an intent to avoid arbitration, where it states:

> [T]he use of alternative dispute resolution mechanisms is intended to supplement, not supplant, the remedies provided by this Act.  Thus, for example . . . any agreement to submit disputed issues to arbitration, whether in the context of a collective bargaining agreement or in an employment contract, does not preclude the affected person from seeking relief under the enforcement provisions of this Act.

(H.R. Rep. No. 101-485 (pt. 3) at 76 (1990), as reprinted in 1990 U.S.C.C.A.N. 267, 445, 499-500).  At least one District Court has

---

[17]<u>Compare</u> the ADA at 42 U.S.C. § 12212 ("the use of alternative means of dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under this chapter") to the Civil Rights Act of 1991, see Pub. L. 102-166, §118, 105 Stat. 1081 ("the use of alternative means of dispute resolution, including . . . arbitration, is encouraged to resolve disputes arising under the Acts or provisions of federal law amended by this title."), cited in <u>Patterson</u>, 113 F.3d at 837.

relied upon this passage to preclude a waiver of the ADA's judicial remedies.  See <u>Riley v. Weyerhauser Paper Co.</u>, 898 F. Supp. 324, 326 (W.D. N.C. 1995) (distinguishing <u>Gilmer</u> as applied to the ADA). Another House conference report adopts the statement above, adding:

> It is the intent of the conferees that the use of these alternative dispute resolution procedures is completely voluntary.  Under no condition would an arbitration clause in a collective bargaining agreement or employment contract prevent an individual from pursuing their rights under the ADA.

(H.R. Rep. No. 101-596, at 89 (1990) (Conf. Rep.), as reprinted in 1990 U.S.C.C.A.N. 598.)

This Court is not persuaded.  A court ought to look first to the text of the statute.  <u>Gilmer</u>, 500 U.S. at 26.  The statute itself, far from revealing any bar to arbitration, explicitly allows alternative dispute resolution.  Second, even the quoted excerpts suggest that Congress intended to support, rather than prevent, voluntary arbitration of ADA claims.  Importantly, nothing precludes plaintiffs from pursuing their ADA rights and remedies in the arbitral forum; they are free to make their case before the arbitrator, and, to the extent the arbitration agreement purports to limit their ability to do so, the arbitrator is free to ignore the agreement and follow the statutes.

A similar analysis can be applied to the Minnesota Human Rights Act.  MHRA discrimination claims are arbitrable.  <u>Johnson v. Piper Jaffray, Inc.</u>, 530 N.W.2d 790, 801 (Minn. 1995).  Even if the MHRA can be read to void agreements to arbitrate MHRA claims, <u>see</u>

Minn. Stat. §§ 363A.31, 363A.33 subd. 1 (2004), the MHRA is preempted by the FAA. <u>Johnson</u>, 530 N.W.2d at 804.

Having found that the parties' dispute falls within the scope of a valid arbitration agreement, the Court finds plaintiffs Jeff and Cindy Siebert must arbitrate their claims.[18]

C.   <u>The forum selection clause is enforceable</u>

Forum selection clauses are presumptively valid and enforceable, unless unjust, unreasonable, procured through fraud or overreaching, or unless they would effectively deprive the opposing party of a meaningful day in court. <u>M.B. Rests., Inc. v. CKE Rests., Inc.</u>, 183 F.3d 750, 752 (8th Cir. 1999), citing <u>M/S Bremen v. Zapata Off-Shore Co.</u>, 407 U.S. 1, 15 (1972); <u>see also</u> <u>Hauenstein & Bermeister, Inc. v. Met-Fab Indus., Inc.</u>, 320 N.W.2d 886, 890 (Minn. 1982) (clause enforced unless opposing party can show enforcement "unfair or unreasonable.")   Mere disparity in bargaining power, or lack of opportunity to negotiate, does not render a forum selection clause unenforceable. <u>Carnival Cruise Lines, Inc. v. Shute</u>, 499 U.S. 585, 593 (1991).

Plaintiffs have entirely failed to sustain the "heavy burden

---

[18]Defendants did not style their motion as one to compel arbitration under the Federal Arbitration Act, 9 U.S.C. § 4, but the parties in fact presented and argued the question of whether plaintiffs ought to be compelled to arbitrate. Defendants' counsel made clear his clients' interest in arbitrating any disputes between themselves and the plaintiffs.  Mindful of its duty to secure a "just, speedy and inexpensive" resolution of this matter, the Court construes defendants' motion as though made under the FAA.  Fed. R. Civ. P. 1, 15.

of proof" required to set aside the clause on the grounds of
inconvenience.  Id. at 595.  Florida is not a "remote alien forum"
chosen to discourage legitimate claims; it is simply a forum with
a strong connection to one of the parties -- the AAU.  Id.  The
location and convenience of witnesses, and the expense of travel,
do not make it inconvenient.  See Alpha Sys. Integration, Inc. v.
Silicon Graphics, Inc., 646 N.W.2d 904, 909 (Minn. Ct. App. 2002)
(finding Minnesota residents bound by clause selecting California
forum).  As discussed above, neither the burden of traveling to
Florida nor the cost of arbitration deprives plaintiffs of a
meaningful day in court.

    In contrast to the plaintiffs in Carnival Cruise Lines, the
Sieberts suggest they had no notice of the forum selection clause.
(Pl. Mem. at 23, 42.)  This argument fails for the reasons set
forth in the analysis of the validity of their agreement to
arbitrate.  Beyond this, the Sieberts fully expected that, after
their previous requests to join the AAU and the denial of their
request for an ASL interpreter, the AAU would persist in doing so,
leading to this effort to advance their claims through litigation.
And, of course, shortly after joining the AAU, they learned from
Mr. Durham that a contract had been formed.  They received further
notice of the contract on their membership cards.

    The forum selection clause is reasonable, and must be enforced
against Jeff and Cindy Siebert.  Accordingly all claims related to

the 2003 season are dismissed as to Jeff and Cindy Siebert.

III.  <u>Conclusion</u>

Plaintiffs' memorandum on standing is accepted.  Jeff and Cindy Siebert's claims as to the 2003 season are dismissed; these claims must be submitted to binding arbitration in Florida.  All remaining claims are stayed pending arbitration.

Dated:  March 14, 2005


<u>s/ James M. Rosenbaum</u>
JAMES M. ROSENBAUM
United States District Judge